UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **THEODORE J. LEE** | **CIVIL ACTION NO. 3:11-cv-0925** |
| **VS.** | **SECTION P** |
| | **JUDGE DONALD E. WALTER** |
| **RICHLAND PARISH DETENTION CENTER, ET AL.** | **MAGISTRATE JUDGE KAREN L. HAYES** |

REPORT AND RECOMMENDATION

*Pro se* plaintiff Theodore J. Lee filed the instant civil rights complaint pursuant to 42 U.S.C. §1983 on June 17, 2011. Plaintiff is a pre-trial detainee who is awaiting trial on charges of possession with intent to distribute cocaine and conspiracy to distribute cocaine which are pending in Louisiana's Fifth Judicial District Court, Richland Parish.[1] He has been detained at the Richland Parish Detention Center (RPDC) since his arrest on February 15, 2011. He complains that he is being denied adequate medical care and that he was wrongly confined to administrative segregation. In his original complaint, he sued RPDC, Warden Alan Cupp, Dr. Thompson, Lt. Hudson, and Nurses Grant, Atkins, Dear, Henry and Bates; his amended complaint he omitted Dr. Thompson and added Richland Parish Sheriff Charles McDonald as a defendant. He seeks injunctive relief and compensatory and punitive damages.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the Court. For the following reasons it is recommended that the complaints be **DISMISSED WITH PREJUDICE** as

---

[1] See News Release, Louisiana State Police, February 15, 2011 at http://www.lsp.org/lspnewsr.nsf/db14d4e0632f509686256c76005182da/65ce53818a5ef1de8625783800832025?OpenDocument

frivolous and for failing to state a claim for which relief may be granted in accordance with the provisions of 28 U.S.C. §1915A.

### *Statement of the Case*

Plaintiff submitted a 9-page *pro se* complaint which set forth his claims in 34 numbered paragraphs. He also submitted a series of exhibits consisting of correspondence, health directives, and prisoner grievances. [Doc. 1] On August 22, 2011, he was directed to amend his complaint to provide more detailed and specific information. He was ordered to describe what each defendant did to violate his rights and to state when each alleged violation occurred. He was also specifically directed to allege the harm or prejudice he suffered as a result of the alleged violations. [Doc. 5]

On September 20, 2011, he submitted a 19- page complaint along with copies of the original exhibits. In general plaintiff claimed that he suffers from hypertension, hypoglycemia, and is lactose intolerant.[2] He had gastric bypass surgery in February 2008 and has been instructed to eat 6 small meals per day and to allot at least 30 minutes to eat each meal. He was also instructed to wait 30 minutes before or after each meal before drinking any liquids. He maintains that the defendants are aware of his various conditions because he has submitted numerous administrative remedies procedure grievances since he was incarcerated at the RPDC in February 2011. [Doc. 6, ¶1-4]

As noted above, plaintiff was instructed to describe what each defendant did to violate his rights, to state when each violation occurred and to describe the harm suffered as a result of the violation. In his amended complaint he alleged generally that the defendants "have continually

---

[2] Hypertension is the term used to describe high blood pressure; hypoglycemia is a condition that occurs when one's blood sugar (glucose) is too low; lactose intolerance is the inability to digest lactose. Lactose is a type of sugar found in milk and other dairy products. Medline Plus, A Service of the U.S. National Library of Medicine and National Institutes of Health, Medical Encyclopedia http://www.nlm.nih.gov/medlineplus/encyclopedia.html

allowed [plaintiff] to be given incorrect doses of medication at incorrect intervals.." causing him to "ingest an excessive amount of medication." He also claimed, generally, that the defendants "continually allowed [him] to be given medication that was not prescribed for him..." and they "...continually failed to properly monitor [his] blood pressure" causing him to suffer from severe headaches, fatigue, confusion, vision problems, chest pain and difficulty breathing. [Doc. 6, ¶21]

Plaintiff then alleged the following specific instances of fault:

1. On February 23, 2011, defendant Dear gave plaintiff an excessive amount of Clonidine[3] in an attempt to lower his blood pressure. Plaintiff was then taken to the hospital. [Doc. 6, ¶22][4]

2. On February 25, 2011 a note was posted by RPDC medical staff advising corrections staff that plaintiff should be provided a bland diet and a nightly snack. [Doc. 6-1, p. 37] He claimed, however, that Hudson, Cupp, McDonald, and Grant "failed to ensure that [his] special diet needs are met." [Doc. 6, ¶23] On some unspecified date, the medical department posted another notice advising the food service and corrections staff as follows, "Please do not give Mr. Lee the ham sandwich at night. Only peanut butter sandwich. The meat has to [sic] much salt and his B/P [blood pressure] is to [sic] high for the sodium intake." [Doc. 6-1, p. 55]

---

[3] Clonidine is used alone or in combination with other medications to treat high blood pressure. Clonidine is in a class of medications called centrally acting alpha-agonist hypotensive agents. It works by decreasing your heart rate and relaxing the blood vessels so that blood can flow more easily through the body. MedlinePlus, a Service of the U.S. National Library of Medicine and National Institutes of Health.
http://www.nlm.nih.gov/medlineplus/druginformation.html

[4] Plaintiff alleged that an overdose of this medication can cause bradycardia (slow heart rate), atrial fibrillation (irregular heartbeat), coma, seizure, decreased reflexes, drowsiness, and shallow or slower breathing. However, he did not allege that he experienced any of these symptoms as a result of the events of February 23, 2011 or at any other time during the period he has been incarcerated at RPDC.

3. On April 3, 2011, the prison kitchen staff neglected to ready plaintiff's nightly snack and he was told to return to his dorm and await the delivery of the snack by a member of staff. After waiting 3 hours, plaintiff approached Hudson and Atkins and inquired about the snack. Hudson shouted expletives and ordered plaintiff to leave the area. Plaintiff then telephoned his wife who then telephoned Atkins and later Hudson. Hudson "became very hostile and hung up on her." When she called back, Hudson hung up on her again. According to plaintiff, this incident caused "pain, suffering, and emotional distress." He was denied a grievance form that night but was provided a grievance form and submitted his grievance about this incident on April 5. In the grievance, plaintiff asked only that the guard who was disrespectful be removed from his job. [Doc. 6, ¶24; Doc. 6-1, pp. 38-41]

4. On April 4, 2011, plaintiff's wife wrote a letter to Warden Perry Fleming complaining that "the employees at [RPDC] are still demonstrating deliberate indifference to my husband's ... dietary and medical needs." She concluded by advising that the letter was "the final warning." [Doc. 6-1, p. 84] She faxed a copy of the letter to Warden Cupp on the same date. [Doc. 6-1, p. 85]

5. On April 12, 2011, plaintiff submitted another grievance complaining that on March 16, 2011, and again in April, he was denied visitation with his family who had driven to Louisiana from their home in North Carolina for that purpose. He noted that other co-defendants were allowed visitation. In the grievance, he requested no specific relief other than "... to let the great state of Louisiana, and the people in higher authority know what's going on here at Richland Parish Detention Center. It's obvious what's going on, now something needs to be done about it." [Doc. 6-1, pp. 46-49]

6. On April 16, 2011, the medical staff failed to give plaintiff his noon dose of blood pressure

medicine. (He claimed there were other similar incidents, but did not specify when these occurred.) His grievance [Doc. 6-1, pp. 42-44] was ignored. [Doc. 6, ¶26]

      7. On April 17, 2011, plaintiff submitted another grievance. He complained that on that date, at last meal, the cafeteria ran short of trays and he and some other inmates had to wait to be served. He was eventually provided a tray and served his meal. However, two minutes later, he was told to return to the dorm because another dorm was ready to be served. He noted that he is to be allowed extra time to eat because of his gastric bypass status and he requested the removal of the guards who were responsible for ordering him to leave the cafeteria. [Doc. 6-1, pp. 50-52]

      8. On some unspecified date in April, plaintiff asked Bates to test his glucose level. Bates then waited until 3:00 a.m. the following morning and tested plaintiff's glucose level. [Doc. 6, ¶27]

      9. On April 23, 2011, plaintiff's Medication Information Report revealed the following medication history. Plaintiff was prescribed these medications or services by Dr. Thompson: (a) Two 25 mg Benadryl[5] 2 times/day; (b) one .2 mg Clonidine per day; (c) blood pressure check 2 times/day; (d) .3 mg Clonidine 3times/day and monitor blood pressure; (e) 10 mg Norvasc[6] at bedtime; (f) .3

---

[5] Benadryl or diphenhydramine is used to relieve red, irritated, itchy, watery eyes; sneezing; and runny nose caused by hay fever, allergies, or the common cold. Diphenhydramine is also used to relieve cough caused by minor throat or airway irritation. Diphenhydramine is also used to prevent and treat motion sickness, and to treat insomnia (difficulty falling asleep or staying asleep). Diphenhydramine is also used to control abnormal movements in people who have early stage parkinsonian syndrome (a disorder of the nervous system that causes difficulties with movement, muscle control, and balance) or who are experiencing movement problems as a side effect of a medication. Diphenhydramine is in a class of medications called antihistamines. It works by blocking the action of histamine, a substance in the body that causes allergic symptoms. Medline Plus, supra.

[6] Norvasc or amlodipine is used alone or in combination with other medications to treat high blood pressure and chest pain (angina). Amlodipine is in a class of medications called calcium channel blockers. It lowers blood pressure by relaxing the blood vessels so the heart does not have to pump as hard. It controls chest pain by increasing the supply of blood to the heart. If

mg Clonidine 3 times/day; and (g) 40 mg Lisinopril[7] daily.

     Dr. Ghaffar at the E.A. Conway Hospital prescribed the following: (a) HCTZ,[8] 25 mg 1 time/day; (b) 10 mg Lisinopril 1 time/day, increased to 20 mg on 3/1/11; (c) one multivitamin per day; (d) 25 mg Metoprolol[9] 2 times/ day, increased to 50 mg on 3/1/11; (e) and, 10 mg Loratadine[10] at bedtime.

     An unnamed physician at LSU medical center prescribed 5 mg Norvasc once daily.

     Dr. Foust prescribed 20 mg Lisinopril daily and then 40 mg daily on 3/10/11.

     Dr. LaFleur prescribed 50 mg of Metoprolol twice daily on March 10, 2011.

---

taken regularly, amlodipine controls chest pain, but it does not stop chest pain once it starts. Medline Plus, supra.

   [7] Lisinopril is used alone or in combination with other medications to treat high blood pressure. It is used in combination with other medications to treat heart failure. Lisinopril is also used to improve survival after a heart attack. Lisinopril is in a class of medications called angiotensin-converting enzyme (ACE) inhibitors. It works by decreasing certain chemicals that tighten the blood vessels, so blood flows more smoothly and the heart can pump blood more efficiently. Medline Plus, supra.

   [8] HCTZ or hydrochlorothiazide, is a "water pill," is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to get rid of unneeded water and salt from the body into the urine. Medline Plus, supra.

   [9] Metoprolol is used alone or in combination with other medications to treat high blood pressure. It also is used to prevent angina (chest pain) and to improve survival after a heart attack. Extended-release (long-acting) metoprolol also is used in combination with other medications to treat heart failure. Metoprolol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure. Medline Plus, supra.

   [10] Loratadine is used to temporarily relieve the symptoms of hay fever (allergy to pollen, dust, or other substances in the air) and other allergies. These symptoms include sneezing, runny nose, and itchy eyes, nose, or throat. Loratadine is also used to treat itching and redness caused by hives. However, loratadine does not prevent hives or other allergic skin reactions. Loratadine is in a class of medications called antihistamines. It works by blocking the action of histamine, a substance in the body that causes allergic symptoms. Medline Plus, supra.

Dr. Kleeper prescribed .1 mg Clonidine three times daily. [Doc. 6-1, pp. 53-54]

10. On April 24, 2011, defendant Henry gave plaintiff medication that was prescribed for another inmate. However, plaintiff apparently was aware of the error, informed the nurse, and did not take the medication. (Plaintiff claimed that such mix ups have occurred "recklessly and continually" but he did not specify any harm resulting from the mix up.) [Doc. 6, ¶28]

11. On April 25, 2011, plaintiff's wife wrote a letter to Assistant Attorney General Thomas E. Perez complaining about the staff at RPDC. She complained that plaintiff is receiving time-released medication even though she has advised them that such medication cannot be absorbed because of plaintiff's gastric bypass surgery. She also complained about "degrading and abusive treatment" and implied that the staff at RPDC were in violation of federal criminal law as set forth in Title 18 of the United States Code. She attached a list of further complaints concerning conditions experienced by her husband during his detention at RPDC from February 15 – April 24, 2011. [Doc. 6-1, pp. 87-88; 89-93[11]]

---

[11] Plaintiff's wife complained – (1) that plaintiff was forced to purchase underwear, socks, and toiletries from the jail commissary following his arrest. She complained that the items were overpriced and that this circumstance strained the family's finances; (2) that on March 15, 2011, she contacted Warden Cupp and requested visitation privileges which were denied; (3)that on March 28, 2011, plaintiff was admitted to the hospital because of high blood pressure; he remained hospitalized for 9 hours during which time he was given a sandwich, a bag of chips, and a glass of milk. She complained that "staff" members gave plaintiff milk even though they were aware that he is lactose intolerant. She also complained that his required diet was not being furnished and that he had been admitted to the hospital 3 times between February 15 – March 28, 2011. She also complained that the prison nurses were not giving the appropriate doses of medication; (4) that on April 3, 2011, she received a telephone call from plaintiff who was upset because he was verbally abused by a corrections officer with regard to the mix-up in his evening snack; (5) that on April 11, 2011, she attempted to contact the Warden to arrange for a special visit but her request was denied; (6) that on April 16, 2011, plaintiff missed one dose of his blood pressure medication; (7) that on April 17, 2011, plaintiff was not afforded sufficient time to complete his meal due to a shortage of food trays; (8) that on April 22, 2011, Nurse Henry attempted to obtain a glucose level with a "dirty" needle, but did not actually use the needle in

12. On April 29, 2011, plaintiff asked to see a physician "...because he was suffering from a severe headache due to his severe hypertension." The request was denied and Grant advised that plaintiff's "blood pressure always runs high." [Doc. 6, ¶30]

13. On May 10, 2011, plaintiff filed two grievances against the corrections and medical staff. In the first grievance he complained that while eating, Officer Moore asked him about his diet. Plaintiff advised that he is a gastric bypass patient who is also on a low salt diet. Plaintiff complained to Moore that he is not being properly cared for and is given insufficient time to eat. Moore responded, "... that's what cocaine will get for you..." He complained that his attorney had previously advised him to refrain from discussing his criminal charges and he requested that the staff "do their job professionally..." In the second grievance he complained that he was receiving an inappropriate diet and that his blood pressure was too high. He maintained that he was receiving the wrong medication or too much medication. He also complained that he was receiving an inappropriate diet and his blood sugar levels were low. He concluded by accusing the staff of medical malpractice and requested that the entire medical staff be removed and that the necessary funds be spent to house plaintiff at a medical facility instead of a detention center. He received no response. [Doc. 6, ¶31; Doc. 6-1, pp. 58-64]

---

question; and, (9) on April 24, 2011, Nurse Henry confused plaintiff's medication with that of another inmate. When plaintiff realized the error he advised the nurse and he was apparently given the appropriate pill.

Plaintiff's wife also complained in general about – nurses and officers questioning plaintiff about his pending criminal charges; officers discussing information about the case with one another; officers selling drugs and tobacco to inmates; officers providing food from restaurants to inmates for money; officers verbally abusing inmates; officers bragging about physical abuse inflicted on inmates; and, officers abusing power and neglecting medical problems of inmates based on race. [Doc. 6-1, pp. 90-01]

14. On May 11, 2011, plaintiff informed Cupp about his medical problems and the unprofessional behavior of the prison staff. [Doc. 6, ¶32] Specifically, plaintiff complained that the "medical department is now giving me false reading on my blood pressure, or just don't know what they are doing, and now tonight, after my blood pressure was taken, I was denied my reading." He complained that Dear had given him a false reading and his proof of this allegation was, "I've had blood pressure issues long enough to know my body and situation and my blood pressure has never been what she said today. She was simply lying." He accused Atkins of refusing to show him the blood pressure results. [Doc. 6-1, p. 56; Doc. 6, ¶33] On the same day he wrote another letter to Cupp complaining in general terms about the unprofessional actions of the RPDC staff. [Doc. 6-1, p. 57]

15. On June 27, 2011, plaintiff was taken to the hospital because of blood pressure readings of 180/125 and 198/130. Defendant Henry advised plaintiff that he was being sent to the hospital without his blood pressure medication so that "his blood pressure would still be high when he got there." According to plaintiff, this placed plaintiff at risk for greater complications. According to his complaint the physician at E.A. Conway Hospital "was unable to assist or adjust the medication because he had no idea of how [plaintiff] was reacting to the medication that was withheld from him." [Doc. 6, ¶36]

16. On June 28, 2011, Officers Searcy, Bruiser, and Alan escorted plaintiff, in shackles, to Warden Cupp and Captain Dear. According to plaintiff, "Cupp attempted to intimidate [plaintiff] in response to the open records request his wife submitted." In addition, Cupp advised plaintiff that his wife's visitation privileges were revoked because she "was breathing down his neck." [Doc. 6, ¶37]

17. On July 2, 2011, Grant was advised that plaintiff's stool was bloody; plaintiff requested sick call; however, he was not seen or treated. While the symptom could indicate a serious illness in light of plaintiff's status as a post-gastric bypass patient, he did not allege any injury as a result of this incident. [Doc. 6, ¶38]

18. On July 6, 2011, Henry advised plaintiff that some of his medicine was on back order. Plaintiff was unable to take the medication for a period of 5 days. Plaintiff did not allege that any harm befell him as a result of this incident. [Doc. 6, ¶39]

19. On July 10, 2011, Bates attempted to give plaintiff five extra pills that belonged to another prisoner. When plaintiff advised her that the medication did not look familiar, Bates realized her mistake and gave the medication to the inmate for whom it was prescribed. Bates also advised plaintiff that his blood pressure would no longer be monitored twice a day as previously ordered. According to plaintiff this decision was made without an examination by a physician. Previous blood pressure readings were 196/124, 199/125, 168/126, 178/116, and 213/134. [Doc. 6, ¶40]

20. On July 19, 2011, plaintiff was taken to the hospital for treatment of hypertension because his blood pressure was 190/140. However on July 28, 2011, his blood pressure was 200/180 and plaintiff was not taken to the hospital, but instead sent to his dorm and told to rest and await assistance from staff. (Plaintiff claimed that left uncontrolled, hypertension could lead to various serious physical conditions; however, he did not claim that he suffered from any of these conditions. Instead, he alleged that he "complained to RPDC staff about several medical issues, such as severe chest pains, severe headaches, shortness of breath, kidney pains, and blood in his stool..."; however, he did not allege when these complaints were made and what steps if any were taken to alleviate the symptoms.) [Doc. 6, ¶34]

21. On August 18, 2011, Grant accused plaintiff of malingering after plaintiff's wife called the jail complaining that plaintiff had a rash. Grant told plaintiff that if he did not have a rash he would be confined to administrative segregation for malingering. Plaintiff filed a grievance and ultimately, Cupp answered the grievance and denied plaintiff's claim that he was threatened by Grant. Instead, Cupp advised that his staff merely informed the plaintiff of the consequences of malingering. On August 23, 2011, plaintiff was moved to administrative segregation "for unknown reasons." [Doc. 6, ¶35]

22. On August 21, 2011, Henry gave plaintiff "incorrect medication." Plaintiff did not allege any injury resulting from the mistake. [Doc. 6, ¶41]

23. On August 23, 2011, plaintiff was placed in administrative segregation. According to plaintiff, this placement was "for no other reason than to intimidate him for the grievances filed and the civil complaint." Plaintiff's wife complained to Sheriff McDonald that plaintiff was placed in segregation without cause and the Sheriff denied that allegation and justified the placement because plaintiff was "picking with us, filing grievances for every little thing." When plaintiff's wife complained that plaintiff had no access to hot water, he agreed to rectify the situation. According to plaintiff, his placement in administrative segregation has impacted his "social skills" and this will ultimately affect his family and work life. He also claimed that he is "subjected to undue stress because of this unjust confinement which causes his hypertension to be exacerbated. [Doc. 6, ¶42]

24. On August 24, 2011, Atkins "intentionally wrote down an incorrect blood pressure reading ... so as to make the record appear that [plaintiff's] blood pressure reading was lower than it actually was." [Doc. 6, ¶43]

25. On August 31, 2011, plaintiff complained of chest pains to Dear. Dear advised plaintiff

11

to walk around, but plaintiff's cell which is 12 x 8 is too limited a space. Dear then told plaintiff that she would speak to Grant, but Grant did not acknowledge the problem and plaintiff was not taken to the hospital. [Doc. 6, ¶44]

 26. On September 1, 2011, plaintiff did not receive his snack. [Doc. 6, ¶45]

 27. On the same date Dear did not check plaintiff's blood pressure. [Doc. 6, ¶46]

 28. On the same date Cupp summoned plaintiff to his office. He advised plaintiff that if he stops writing grievances and asks his wife to stop her "The Fight Against Richland Parish Detention Center" Facebook page and drops the civil complaint, he will be released from administrative segregation. Plaintiff claimed that this form of intimidation caused emotional distress that exacerbated his hypertension. Plaintiff also complained that his placement in administrative segregation causes mental suffering that will require the services of a therapist. [Doc. 6, ¶47]

 29. On September 2, 2011, Dear gave plaintiff his noon-time dosage of medication at 3:05 p.m. She also failed to take his blood pressure. [Doc. 6, ¶48]

 30. On September 3, 2011, Atkins "intentionally wrote down an incorrect blood pressure reading... to make the record appear that [his] blood pressure reading was lower than it actually was." [Doc. 6, ¶ 49]

 Plaintiff concluded his amended complaint by alleging that the defendants "have consciously and recklessly disregarded the consequences of their acts or omissions as it relates to [plaintiff's] special diet, severe hypertension, and hypoglycemia." [Doc. 6, ¶53] He also complained that the defendants' have "conspired to injure, oppress, threaten and intimidate [plaintiff] in the free exercise or enjoyment of rights and privileges secured to him by the Constitution or laws of the United States..." [Doc. 6, ¶56] He also alleged that the defendants have violated his rights to due process

"by failing to provide adequate medical care and special diet needs, and subjecting [plaintiff] to restrictive and inhumane conditions of confinement..." and that he was confined to administrative segregation without due process. [Doc. 6, ¶61-63]

### *Law and Analysis*

*1. Screening*

When a prisoner sues an officer or employee of a governmental entity pursuant to 42 U.S.C. §1983, the court is obliged to evaluate the complaint and dismiss it without service of process, if it is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C.§1915A. The screening provision of 28 U.S.C. § 1915A "applies regardless of whether the plaintiff has paid a filing fee or is proceeding *in forma pauperis*." *Ruiz v. United States*, 160 F.3d 273, 274-75 (5th Cir.1998). Plaintiff has paid the full filing fee.

A civil rights complaint fails to state a claim upon which relief can be granted if it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations of the complaint. Of course, in making this determination, the court must assume that all of the plaintiff's factual allegations are true. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir.1998). Nevertheless, in order to be afforded the benefits of this assumption a civil rights plaintiff must support his claims with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) (A court should begin its analysis by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there

are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); see also *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir.1995).

Nevertheless, a district court is bound by the allegations in a plaintiff's complaint and is "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint." *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d at 97.

Courts are not only vested with the authority to dismiss a claim based on an indisputably meritless legal theory, but are also afforded the unusual power to pierce the veil of the factual allegations and dismiss those claims whose factual contentions are clearly baseless. *Neiztke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

Plaintiff filed an original complaint; he was directed to amend his complaint to provide specific facts. He filed an amended complaint along with various exhibits which outline his contentions. Further amendment would serve no useful purpose.

Read liberally, plaintiff's complaint and amended complaint allege that the defendants failed to provide timely and appropriate medical care and diet. He also complained that he was unlawfully confined in administrative segregation. For the following reasons, his complaint should be dismissed.

## 2. Medical Care

Clothed with the presumption of innocence, pre-trial detainees have a constitutional right to be free from punishment. *See Bell v. Wolfish*, 441 U.S. 520, 534-37, 99 S.Ct. 1861, 1871-73, 60 L.Ed.2d 447 (1979). Accordingly, a pre-trial detainee's claims of unconstitutional conditions or circumstances are analyzed under the Fourteenth Amendment's guarantee of due process of law as opposed to the Eighth Amendment's prohibition of cruel and unusual punishment, which applies

only to convicted inmates. *See id.* at 535 n. 16, 99 S.Ct. at 1872 n. 16; *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir.1996).

Such claims, when filed pursuant to Section 1983 by pre-trial detainees, are analyzed as either conditions of confinement or episodic acts resulting in the deprivation of constitutional rights without due process. A "conditions of confinement" case raises a constitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement. *See Scott v. Moore*, 114 F.3d 51, 53 (5th Cir.1997) (citing *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir.1996). In such cases, the constitutional harm is caused by the condition itself. "This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir.1997). When a pretrial detainee challenges the general conditions of confinement, as opposed to particular acts or omissions, a constitutional violation exists only if it appears that the complained of conditions of confinement are not reasonably related to a legitimate, non-punitive governmental objective. *See Hare*, 74 F.3d at 640 (citing *Bell*, 441 U.S. at 538-39, 99 S.Ct. at 1873-74); see also *Scott*, 114 F.3d at 53 (citing *Hare* ).

On the other hand, if the detainee's complaints are based on particular acts or omissions of one or more officials, the action is characterized as an "episodic act or omission" case. *See Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir.1999); *Hare*, 74 F.3d at 645. Under this analysis, a detainee's due process rights are violated only if the defendants acted with deliberate indifference to a substantial risk of serious harm which resulted in injury. *Wagner v. Bay City,* 227 F.3d at 324 (citing *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir.1996) *(en banc)*; see also *Edwards v. Johnson*, 209 F.3d 772 (5th Cir. 2000) ("To prove an underlying constitutional violation in an episodic acts case, the detainee must establish that the official acted with subjective deliberate

15

indifference."). Deliberate indifference requires that the defendants have subjective knowledge of the risk of harm. *Id.* Mere negligence or a failure to act reasonably is not enough. The defendants must have the subjective intent to cause harm. *Id.*

In other words, deliberate indifference in this context means that: (1) the prison officials were aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the officials actually drew that inference; and (3) the officials' response indicated that they subjectively intended that harm occur. *Thompson v. Upshur County, Texas*, 245 F.3d at 458-59. Thus, "... the failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001)(emphasis supplied). Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459 (emphasis supplied). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir.1997); see also *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.1999).

In addition, the alleged deprivation must be "sufficiently serious," which means that "the inmate must show that he [was] incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 847 (emphasis supplied). To rise to the level of a constitutional violation, the conditions must be " 'so serious as to deprive [plaintiff] of the minimal measure of life's necessities...' "*Alexander v. Tippah County*, 351 F.3d 626, 630 (5th Cir.2003) (quoting *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995)).

"Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of*

16

*Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "[T]he plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. (internal quotation marks and citation omitted). "[M]ere negligence, neglect, or medical malpractice" do not constitute deliberate indifference. *Varnado*, 920 F.2d at 321. Even "gross negligence" does not establish deliberate indifference. *Hernandez v. Tex. Dep't of Prot. and Reg. Servs*., 380 F.3d 872, 882 (5th Cir. 2004).

Finally, in order to prevail on such a claim, the plaintiff must demonstrate that he suffered some harm that was more than *de minimis*. *See Siglar v. Hightower*, 112 F.3 191, 193-94 (5th Cir.1997); *Alexander v. Tippah County, Miss*, 351 F.3d at 630-31; *Luong v. Halt*, 979 F.Supp. 481, 486 (N .D.Tex.1997).

Plaintiff presented a litany of complaints; however, taken together, his complaint does not establish deliberate indifference on the part of any of the defendants. Indeed, it appears that plaintiff received appropriate care under the circumstances. For example, between February 15 and March 28, plaintiff was taken to a hospital at least three times for treatment; he was again taken to the hospital on June 27 and on July 19. Further, the records submitted indicate that he was examined by at least six physicians – Dr. Thompson, Dr. Ghaffar, an unnamed physician at the LSU Medical Center, Dr. Foust, Dr. LaFleur, and Dr. Kleeper – each of whom prescribed medication for plaintiff.

Further, with regard to his dietary complaints, it appears that the defendants complied with the dietary restrictions placed on plaintiff as a result of his hypertension and his gastric bypass surgery. Plaintiff's detailed litany of complaints points to only a few instances where there were errors or delays in meeting his dietary needs or providing his prescribed medications. Likewise,

although he maintains that the defendants erroneously logged his blood pressure on several occasions, he was unable to demonstrate that these instances amounted to deliberate indifference. As previously noted, a showing of deliberate indifference with regard to medical treatment requires the inmate to submit evidence that prison officials " 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001) (citation omitted). Plaintiff has not show such wanton disregard for his needs and therefore, his medical care claims must be dismissed as frivolous.

*3. Retaliation*

**Plaintiff implies that his transfer to administrative segregation was an act of retaliation.**

To prevail on the claim for retaliation under Section 1983, a civil rights plaintiff must prove (1) the exercise of a specific constitutional right; (2) the defendants' intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation, which, in this context means that, but for the retaliatory motive, the complained of incident would not have occurred. *McDonald v. Steward*, 132 F.3d 225, 2331 (5th Cir.1998). The prisoner must produce direct evidence of motivation, or, the more probable scenario, allege a chronology of events from which retaliation may be plausibly inferred. *Woods v. Smith*, 60 F.3d 1161 (5th Cir.1995). The plaintiff must allege more than just his personal belief that he is the victim of retaliation. *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir.1999). Here, plaintiff has alleged, in conclusory fashion, that his confinement to administrative segregation was in retaliation for the numerous grievances and complaints filed by him or on his behalf by his wife.

With regard to this claim, plaintiff failed to establish causation as required by the

jurisprudence. As noted above, plaintiff must allege facts to demonstrate that "but for" the exercise of his constitutional right, the alleged retaliatory adverse act –his transfer to segregation– would not have occurred. Indeed, the pleadings themselves establish a more plausible explanation for the transfer. According to the pleadings, plaintiff entered into custody in February 2011; he was not transferred to administrative segregation until August 23, 2011. The chronology supplied by the pleadings does not clearly establish that the transfer was an act of retaliation; indeed, it appears that the transfer was a good faith attempt to curtail the numerous frivolous complaints filed by a dissatisfied prisoner. As noted by Sheriff McDonald, and confirmed by the pleadings themselves, plaintiff and his wife continued, after fair warning, to file "grievances for every little thing." Jail officials have the authority to impose appropriate sanctions against those inmates who abuse or otherwise violate the prison grievance system. In other words, it appears that plaintiff was confined to an administrative segregation cell because of his abuse of the administrative remedies system, and not as an act of retaliation. Plaintiff is not permitted to insulate himself from legitimate disciplinary actions by claiming that the imposition of such actions were acts of retaliation. *Woods*, 60 F.3d at 1166.

*Conclusion and Recommendation*

Plaintiff's complaints do not establish a Constitutional violation . Therefore,

**IT IS RECOMMENDED** that plaintiff's civil rights complaint – including his claims for injunctive relief and damages – be **DISMISSED WITH PREJUDICE** as frivolous and for failing to state a claim on which relief may be granted in accordance with the provisions of 28 U.S.C. §1915A.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties

19

aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14)days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See** *Douglass v. United Services Automobile Association,* **79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, October 25, 2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE